The final case for argument this morning is 15-1773 REG Synthetic Fuels v. Neste Oil. Let's check it out. Okay, I guess we're ready. My name is John Gills. I am counsel for patent owner REG in these proceedings. I have ten minutes for argument, five minutes for rebuttal. We are appealing the decision of the board. We think that two errors were made with respect to their invalidation of Claims 1 of 5 and 8 of the 804 patent, specifically an error based on invalidity by Dendy and invalidity by Craig. With respect to Dendy, we believe the board incorrectly found that Claims 1 of 3, 5, and 8 were invalid by Dendy because the board applied a wrong conception analysis and wrongly excluded evidence that the 804 inventor here, Mr. Apari, had an earlier invention date that predated Dendy. With respect to Craig, briefly, we found that the board erred in finding that Craig anticipated Claims 1, 3, 4, and 8 of the 804 patent, particularly when that finding was clearly based on inherent anticipation. It is undisputed that the reference in question did not expressly disclose the at least 75 weight percent required by the claims. Well, that's because they used a different method, right? They used the peak area percent? Right, and the board acknowledged in its final written decision that peak area percent and weight percent are not equivalent. And here, what the board did was credit NST's expert, Dr. Klein, who used response factors to try to correlate peak area percent, on the one hand, to weight percent. But the objective evidence, here we presented GOROX, TRASIA, and even Dendy, but particularly with GOROX and TRASIA, that evidence said, you've got to look at the relative response factors for the particular machine in question. Here, Craig used a GCMS detector. There was no information in the record on the actual operating conditions, or what response factors were appropriate for the machine or detector that Craig used. All Klein did was pull response factors out of other literature. What GOROX and TRASIA say is that when you do that, you've got to apply correction. And particularly, TRASIA says that if you don't apply correction, you can have error up to 20%. And that's at JA2965, also supported by JA3905-07, and also in our expert report, Mr. Lamb's, or Dr. Lamb's second declaration. In that portion of TRASIA, it was describing what some other reference, SAUDER, was talking about, with respect to SAUDER's own test results, right? Right, but I think what... I guess what I'm trying to figure out is, is this some hard and fast rule? If you don't do the correction, then all of a sudden, you know, any attempt to translate from area percent to weight percent is going to be so unreliable that it could be as great at 20%. Or was TRASIA being more observational about something that SAUDER was simply describing about SAUDER's own testing? I think when you look at the objective evidence in full, and you look at the detectors in question, Craig used a GC-MS detector, which is understood by those of skill in the art as helping you identify what a compound is. But if you want a quantitative measurement of how much you have, a person of skill in the art in the literature talks about the need to use a GCFID detector, which is what Dindy does at JA656, and part of what our expert, and even our own inventor, did. He used GCFID data to determine quantitatively what was the actual weight percent of the high even carbon number paraffins in question. And he did that long before there was this priority dispute, and we submitted evidence of that at JA263946. And again, what GOROX and TRASIA talk about is you use these relative response factors, but then you have to apply correction. The objective evidence requires certain calibration data and information about the equipment being used, and here we didn't have that. And so what Dr. Klein does is he first uses some RMR values in Sioux, then he uses some RMR values that he pulls out of GOROX and TRASIA to get some data, and all the board says is what he comes up with is about the same. But Klein admits that he never uses correction, which is what GOROX and TRASIA tell you to do in both of those references. And what's interesting is the board refuses to find that Claim 2, which requires an 80 weight percent in the claim of even carbon number paraffins, the board refuses to find that Claim 2 is anticipated, because the data that Klein presents shows 82 weight percent. So if 82 weight percent isn't close enough to at least 80 weight percent, how is 82 weight percent close enough to 75 weight percent? The board doesn't explain why that delta is adequate, and I think that delta is inadequate. Couldn't the inference be that there's a buffer zone between the measured 82 weight or the calculated 82 weight and the claimed 75 weight, so that the board just had a much greater sense of peace of mind that the 75 percent or higher value was met by the 82 percent calculated number compared to a claim that's calling for 80 percent or higher, where that maybe was just a little too close for comfort for the board to feel confidence in affirming that kind of a rejection? Again, we submit that the board doesn't make that analysis of what is an acceptable buffer, and you've got to have a prior reference to hold on to. And here, the objective evidence of record, Shirasia, reports error up to 20 percent. And to me, if you're going to have any type of reasonable buffer, you've got to be outside of the reported error range. Shirasia also mentioned 3 to 5 percent error rate, right? Right, but there's no discussion of why 3 to 5 percent error in this case is more likely, as opposed to the upper end of 20 percent, particularly when we simply don't have the data on what equipment Craig used. And again, Klein does not go through that analysis as to why the error is expected to be in the lower end of the range, as opposed to the higher end of the range, and nor does the board go through that analysis, which we think would be necessary. Before we run out of time, I want to turn to what I guess is really the first issue that you raised. Yes, so let's talk about the board's error with respect to Dendy. Again, we think the wrong conception analysis was applied. The law, and the law of this circuit, says the inventor doesn't need to attach special significance to his experimental results. He only needs to appreciate the fact of what he made. If hypothetically, we or I were to conclude that Exhibit 2061 should have been admitted for the purposes of showing that this particular inventor was trying to get to a high, high purity of even carbon number paraffins, and then that, in addition to the admitted exhibits, establishes conception, then is there any need to go further and try to do this trench warfare through the remaining exhibits? I think we've got enough, even without 2061, which was admitted by the board for the limited purpose of showing that Mr. Ephardt contacted Microtech, a known producer of PCMs, but I would agree with you. 2061 only further adds to the pie that already establishes conception. Let me ask the question in a slightly different way. If we thought the currently admitted evidence, plus or without plus the 2061, was sufficient to mandate a conception finding, do we need to reach the other evidentiary exclusion issues, or are those immaterial to anything remaining in the proceedings, such as reduction of practice? I think you may not need to look at them, because as we argue in our brief on reduction of practice, the admitted evidence by the board, exhibit 2004, 2007, 2011, 2058, all show reduction of practice. And I want to point out with respect to Price and Loom, which we also cite, or Price, which we cite in our papers, and Loom, which is a case that Price cites, Price involved a single drawing, exhibit 13. I'm trying to remember, the board never reached a finding on reduction of practice or diligence here, right? They did not. So I don't know if we'd be inclined, if we were to agree with you on conception, to decide up here in the first instance on diligence and reduction of practice, especially when I think your argument is about a simultaneous conception of reduction of practice, whereas conception probably doesn't require some proof of conception that it works for its intended purpose. In reduction of practice, that is a requirement. And then there's some question on this record in front of us on whether or not there needed to be additional testing to establish that this did work or could work as a PCM or as a diesel product in light of possible impurities and things like that. I don't think there's any question that this was a useful composition. Mr. Apari certainly knew on May 31st of 2007, when he got the chromatogram in exhibit 2004, that he had a useful diesel product. The prior art already established, we cited to Wong in our papers, that the usefulness of diesel fuel products were well-known. And compositions of this type, we also cite too in the patent, were useful as specialty chemicals, diesel fuels, fuel additives. Is there something else in the record that says you have to make sure that there isn't a high number of impurities, though, in the resulting product? Not that's covered by the claim. When we look at conception, we've got to look at the claim language. And the claim language has a phase change composition that has this 75 weight percent even carbon number paraffins made by HDO using fatty acids and esters, the type of feedstocks that are mentioned in the claim. Here, part of what we argue in our brief, our opening brief at 57 and 58, is that reduction of practice is commensurate with conception. That chromatogram showed that as of May 31, 2007, Mr. Apari had produced at Centralium a composition according to the method that met the claim limitation. And he continued to do that work over the next several months within Centralium from about June to August or October of 2007 or so. And those exhibits of additional 18 GCFID chromatograms are in exhibit 2007. And then SWRI with their work and the communications back and forth in exhibit 2011. And in 2058, you have another 80 or so GCFID chromatograms, most of which show, again, claim compositions meeting all of the claim limitations that are at issue, claims 1 to 5 and 8. So again, unlike Price, where there was quibble about a single drawing and whether that drawing was independent cooperation, we've got in the relevant time period, so we're looking at the time period from prior to Dendy. Dendy was filed June 13, 2008. And if you look at the chromatograms in 2058, and again, there are 80 of them, but if you only focus on the ones that are prior to June 13, that's 60-plus chromatograms just in that single exhibit, plus the ones that Mr. Apari and people working under his direction at Centralium, the predecessor to REG, got internally. These show production of the claim composition according to the process and using multiple feedstocks. He didn't just use... The skills? Yes, sir. I guess the chromatograms, when you add up all the percentages for the C14, C16, C18, C20, they get you to roughly 80%? Yes, sir. At least 75% as to the vast majority of the chromatograms that are in the admitted evidence. The charts that I'm reading in Exhibit 2058 report out area percent, not weight percent. And I'll comment on that. And again, this is something that is in the record in that Mr. Apari and both SWRI are using GCFID. And GCFID, again, is a different type of detector than the mass spec detector used by PREC, the prior art that we talked about earlier. A mass spec detector is only accurate for telling you what you have. The FID detector is a much better approximator of the percentage of what you have. And even the peak area in a GCFID detector is going to be much closer to the weight percentage in a FID detector than what you would get using a mass MS detector such as PREC did. So those two are more equivalent. We're not talking about the equivalent between peak area of an MS detector on the one hand versus weight percentage on a FID detector on the other hand. We're talking about the same detector, two different types of measurements, and within that same detector, they're close. But even there's testimony from Mr. Apari that he did some correction within his lab. And he followed the right steps and did correction. None of that was done by Dr. Klein when he analyzed PREC. And the board even acknowledging that correction could be done doesn't explain why Klein's analysis of PREC is acceptable. And we think that's clear error, particularly when you're talking about inherent anticipation. This is not something that is within the four corners of PREC. You have to look outside of PREC to an expert who admittedly didn't go through all the steps. That's error. Okay. I think we're going to bring this to an end while we store some rebuttal time. Yes, ma'am. Thank you. Thank you. Thank you, Your Honor. May it please the Court. Mike Flitter for NSAO. The board thoroughly analyzed the evidence here and made detailed factual findings. And they're both in their final written decision and in their decision on the motion to exclude evidence. And RIT has not shown that those findings lack substantial evidence. The board also applied the correct legal analysis on the DINDI issue on conception. The board relied on in vitrogen. Can we first go to the FID detector versus MS detector? Yes, Your Honor. There's an argument that the other side is making and that Craig, I guess, was using the wrong detector. Yes. And so it's the unreliable detector. And so, therefore, we can't really reliably translate that to a weight percentage. What's your response to that? Your Honor, the board heard all of these arguments.  Dr. Klein has a lot of experience, 30 years of engineering experience, PhD from MIT. The board heard his testimony. They evaluated all these different critiques, and they found that his testimony was credible. So they found that it was perfectly reasonable in this art to take these figures that were expressed in GC area percents and use relative response factors to convert them to corresponding weight percents. And if you look, he used three different sets of calculations, including two of the references that REG identified. So he essentially took all the literature values. He did different calculations. He has a table of those results. And the results are very consistent. And the board found that that was persuasive evidence that when one uses relative response factors, as is perfectly appropriate in this art, one gets values that are well above the 75 percent claim limitations. Did he say anything with respect to the two different types of detectors? Well, he acknowledged that it's possible to directly use GCFID for quantitative analysis. That doesn't mean that GCMS is inappropriate. And, in fact, there's nothing in the claim requiring any particular type of analysis of the weight percent. There's nothing in the patent saying that one has to do this in any particular way. And so it simply requires a weight percent of 75 percent. And persons skilled in the art recognize and appreciate that area percents for GCMS can be reasonably converted to corresponding weight percents. And if you look at Dr. Klein's table, the values are almost the same. So this is a small change. Area percent to weight percent change. This is not a very large change in the number. It's a small correction. Now, I wanted to address the 20 percent argument, because I think this is a good illustration of why REG is simply arguing facts. This is from Sriracha? Yes. Is that a 20 percent off a percentage or off a absolute quantity? Now, their reply brief really kind of glosses over what it is. A reply brief is a big cross-section measurement that they're talking about? They're talking about the relative response factor. So, in other words, this reference, and it's a reference within a reference, they don't provide the actual reference, but it's talking about an up to 20 percent error for the relative response factor. But they make no assertion that even if one were to change these relative response factors by 20 percent, that one would get a value below 75 percent. So that's one point. The other point, which I think is really critically important, is that that reference is not talking about paraffins. It's talking about completely different compounds. And it's identified at page JA-2965. It's talking about polycyclic aromatic hydrocarbons and polychlorinated biphenyl pollutants. So those are not the same compounds. So they're asking this Court to make findings about this 20 percent error based on compounds that are not even the same as the claimed compounds. So these are the types of arguments they made before the Board. Can I just ask a clarifying question? Because I'm just confused about this. So I've been looking at this same page, 2965, and the paragraph that talks about SAUDER having a range of errors, plus or minus 20 percent of the observed values. I'm going to say what I understand this to mean, and you please correct me. Those values are atomic or molecular cross-sections. They're not ratios. They're not percentages. So it would not be the case that we're talking about a relative percent moving by as much as 20 percent. Is that right? That is absolutely correct, Your Honor. It's not talking about all of a sudden the weight percent is reduced by 20 percent. It's talking about one of the factors used in their prediction, okay? And they don't point that out in their brief. They sort of gloss over and they say up to 20 percent error. They're not being really particularly fair about that. And I think also, as I said, it's not the same compounds. These are much more complex molecules. So even if you could have up to a 20 percent error for some polycyclic aromatic compound, that is not the linear straight chain alkanes that we're talking about that are in the claims. So it's completely irrelevant in this case. But the fact is the board heard all of these technical critiques and they found them unpersuasive. And they're simply re-arguing technical facts on appeal, which the board carefully considered and found unpersuasive. On the Dindy issue, were some exhibits excluded or discounted, one or the other, on the basis of requiring a particular utility, namely of the, what's the acronym? For PCM. Yeah, right. And the problem here was they decided... is not actually a claim limitation. Yes, they correctly... So there seems kind of a dissonance there. Well, they correctly interpreted the claims. But they found that, well, the problem here was they presented only one witness. They decided to put their entire conception case on the inventor. They have no expert testimony, no other fact witness. And as a result of that, they had problems with evidentiary issues, for one thing. They had hearsay problems. They had authentication problems under the Chen case and other decisions, which have held that it's inappropriate to have an inventor authenticate a document and then say, oh, that corroborates my testimony. That's well established in the case law and the board cited that law. They had hearsay problems. I wanted to mention the Microtech document, which was mentioned. We had a hearsay objection to that document. And as the board pointed out, in footnote 7 on J822, Harvey G. just responded that they were not offering that for the truth. They were only offering it to show that he contacted Microtech. So that document cannot establish any facts that are set forth in that document. It's only the fact that he contacted Microtech is what it was admitted for. So that document is not substantive evidence beyond that one fact. I thought they wanted to show, they used 2061 to show that this particular individual, Mr. Ibarria, was at a minimum thinking about trying to get high purity even carbon number of paraffins. And, you know, was shooting for 90 but already had 80 in his mind. But that's in the substance of the email. The only fact they admitted it for was that he contacted them, which, by the way, when you say he admitted it, you mean the board admitted it. The board admitted it, yes, Your Honor. But they wanted more than what the board admitted it for. But during the proceeding below, they only asked for this to be offered to show that he contacted that company. And also, it's only Ibarria who testified that this is a PCM manufacturer. The fundamental problem is that every single fact they allege comes right back to the inventor. They have no independent testimony. It's only Ibarria who interprets these test results, only Ibarria who says that this company was a PCM manufacturer. Their briefing refers to numerous other cases. Can I just ask, I mean, I guess it's surprising to me a little bit, but you know the cases better than I. It's surprising that there would be a doctrine that says an inventor who happens to be a professional in the field is not qualified without further corroboration to say that IBM is a computer company or micro whatever it is, is in the business of doing PCM materials or whatever it was. As opposed to I did this experiment on this night with nobody looking and no video camera. Yes, Your Honor, but they have no testimony from anyone else on any of his assertions. All right, let me ask my question. Why isn't his testimony on that point, the nature of the company, perfectly sufficient? Well, he cited no evidence to support it. He says it. He's in the business. He says it, but that was just his bald assertion. There's no other evidence of that. And our corroboration doctrine reaches that far that you don't believe a bloody thing he says because he's the inventor? I think it just goes to the weight, Your Honor. The board was entitled to weigh that. That was one of the many facts they considered. They also considered that they refer to all these other people, Jennifer Parker, who allegedly did testing, Vladimir Groover, Shelley Goodman, Katie Boyle, Don Manns, Gary Roth, all mentioned in their briefing. None of them testified. And you look at the SWRI documents, the testing documents repeatedly refer to Eloy Flores, Jennifer White. They never testified. They never came forward with any other testimony except the inventor. And that was the fundamental problem that the board had with their case. They had no other evidence other than Apari's own assertions. And that's where corroboration comes into play. They had an organizational chart, which is JA 3390, identifying 34 Centurion employees, including Mr. Apari. Not one of them testified for them. And I think it's important that they never argued that any witness was unavailable. What's missing from the documents that were admitted in terms of establishing conception, given that the chromatograms or whatever you call them? Yes, Your Honor. The figures, the data sets keep showing that they had the high even carbon number of paraffins that was the entire purpose of this exercise. Right. According to Apari. Again, they have no expert saying that's true. And we have no other witness saying it's true. But that's exactly the right question. And the key here was Invitrogen. Invitrogen specifically held that test results alone are not enough and that there has to be evidence that the inventor timely interpreted or evaluated the results and understood them to show the existence of the invention. That's at 429 F3rd and 1065. The board cited that precedent. That's exactly the problem here. There's no evidence showing that he contemporaneously evaluated, interpreted any test results. If 2061 were to be admitted for what we saw as a non-hearsay purpose, then Exhibit 2061 shows that appreciation, that mental appreciation of 80 percent, right? Well, again, that's going exactly to our hearsay objection, which they did not dispute. They haven't argued that that was an improper hearsay objection. So I disagree with that could be considered for that reason. That was adjudicated below, and that's not how it played out. But the board noted, for example, that even Apari did not testify as to the nature of the material sent to Microtech or how it was produced. That was a JA22, JA3370. And the board found that one can't determine from that exhibit what product or process Apari had in mind. This is JA23. And there's no recognition in that document about the significance of even carbon on the pathogens. And the idea that for a non-hearsay use, that document, they're arguing on appeal that this shows his state of mind, that he believed it could be useful as a PCM. But again, the board considered that argument. That's really not a legitimate non-hearsay use. That's really attempting to show his state of mind for corroboration, that he conceived of the claim that I mentioned. I also wanted to note the Langer case is also entirely consistent with Invitrogen. In Langer, they had the test results. They had X-ray diffraction data. And the court in Langer specifically held that that was not enough and that the inventor's testimony in 1968 couldn't be dated back to 1956. Same problem here. His testimony in 2014 that he appreciated that he had made a high even carbon number composition can't be dated back to the time period here where they were making essentially a diesel fuel. I also wanted to note the board understood, for example, the SWRI documents talking about diesel fuel. That does not connote anything particular to even carbon number paraffins, a diesel fuel. And support for that will be found, for example, in the Craig reference itself. The Craig reference recognizes that diesel fuels are simply paraffins that boil in a particular range, temperature range. And so there's nothing about having a project making synthetic diesel fuel that has anything to do with a composition having to have at least 75 weight percent even carbon number paraffins. And the board recognized that and made findings on that. When they evaluated the SWRI documents. The inherency cases we submit as to Craig also don't apply. This is not a case where the reference was silent. The reference not only had the same starting materials, the same process as the claimant mentioned, but it had results. It had express results in Table 9 broken down by showing all of the even carbon number components and their amounts. So this isn't a case like Finnegan, for example. In Finnegan, the Jefferts reference was silent. All of these cases they cite, the prior was silent on a claim element. That's inherency. This was not an inherency situation. And the board fully appreciated that. The cases they cite, just wanted to note, the cases they cite on the conception have nothing to do with this case. Hybrid Tech, there were 30 witnesses who testified at trial, including numerous witnesses on the conception issue. They had signed and witnessed lab notebooks, which they don't have here. Burroughs had multiple witnesses testifying in a three-week trial. There was a draft patent application that had details of how to use AZT to treat AIDS, which was the claim they mentioned there. The Dow case does stand for the idea that the inventor doesn't have to appreciate the legal patentability of the claims, but the board never did that here. They did not require any finding, any showing of legal patentability. And again, in that case, multiple witnesses testified. There was more than adequate evidence, and they don't have that here. Thank you very much, Your Honor. I don't want to take up a lot of your time, but I really have one question about what your friend said, and that goes to this Exhibit 2061, because he referred to the footnote in the board opinion, footnote 7, and it sounds like the board thinks they were giving you everything you were asking for, i.e., you say, we're not submitting it for the truth, and that they say, for only, only to corroborate that he contacted Microtap. And they say, okay, we'll do that. Did the board miss something in terms of your argument? I think that's an incomplete summary of what we were saying. We were saying that many of the exhibits had some non-hearsay value. Conception goes to the mental state of the inventor, what his beliefs were. So you think this characterization is just wrong? I mean, they misunderstood what you were saying was the reason they wanted to. Yes, I believe so, Your Honor. We put in a lot of the exhibits to show this is what Mr. Alpare believed was his invention, number one, and two, that he communicated his ideas to others. He was communicating with Microtap, and clearly he can. And I agree with Judge Toronto that an inventor can attest to what a company is known for, and that's what he did, and that should be acceptable. Under the cases that we cite in our papers, N.O.R., R.E.E.S., you can look at the circumstances surrounding all of the evidence. There's a case that says it would be the antithesis of the rule of reason to require that all of your corroborating evidence had to come from an inventor. And, again, we didn't just put our case on the back of Mr. Alpare. We submitted, as I mentioned, 99 or so GC chromatograms, about 80 or so that are prior to Dindy. Those are physical exhibits which under price and loom, those exhibits stand on their own. They don't need witness testimony to corroborate them. A person of skill in the art can look at that GCFID, which is a standard technique for giving a quantitative measure of the weight percent of a compound and see that here a chemical composition, here a diesel fuel product, had been produced with at least 75 weight percent. The Invitrogen case is an opposite. There, those were process claims, not composition claims. Can I just ask, does the conception standard require the fact that Mr. Alpare recognized that the even-numbered carbons represented 75, 80, whatever percent? I think here it does. I think a person of skill in the art, even beyond Mr. Alpare, could look at Exhibit 2004 and see the dramatic peak reflected by C18. How could you miss that that is a representation of at least 75 weight percent of an even carbon-numbered paraffin? And lots of the other GCFID chromatograms that we put into evidence show similar results. You've got a high peak and then you've got some smaller peaks of some of the other even carbon-numbered paraffins. It would strain credibility that a person would not recognize what is being shown there. I guess my, I'm not such a person, but when I look at that, I recognize there's a very high peak, but boy, at least, I don't immediately translate that into a number. You can see the number on the document itself, on Exhibit 2004 and many of the other chromatograms. The percentage of the area that's made up by the peak, you can see that? I think you can, and if you can't, an exhibit that we put into evidence, Exhibit 2006, which the board excluded the actual raw data from, for example, Exhibit 2004, is in that spreadsheet. So there you can get the actual numbers. To the extent you can't read it on the chromatogram itself, which is a computer-generated and dated document, we submitted Exhibit 2006, which is a spreadsheet that gives you the numerical numbers. So it will tell you, this is the amount of C-18, this is the amount of C-20, and all of the other even carbon-numbered paraffins. But doesn't conception require that he have noticed and thought about the fact that, if he were looking for it, it would be evident on the document? Again, I think the admitted evidence shows that. I think the peak would give him that recognition, as well as the fact that in Exhibit 2011, that's admitted, the communications with SWRI, he's specifically saying, give me weekly updates, give me other GC chromatograms that look like this. And that's what SWRI, over a period of several months, does. So if you compare, for example, the chromatograms that are sitting back to him, they look the same. One of the exhibits that the board did not admit, Exhibit 2013, I just want to point out, 2013 has essentially the same chromatograms that are in Exhibit 2058 that was admitted. Nessie had objected to 2013 because some of the emails that had the chromatograms as an attachment weren't initially provided. Mr. Apari, with his declaration, said, here's a compilation of the chromatograms that I received from SWRI. We got an objection, so we went back and produced, and labeled as Exhibit 2058, all of the actual emails that attached those chromatograms. So again, between 2011 and 2058, you see Mr. Apari's instruction. He's communicating his ideas to a third party. How to do the process, what to look for, and keep sending me data. Keep sending it to me weekly. I want to keep seeing it. To show that 2013, which was not admitted, and 2058, which was admitted, have the same information. You can see, for example, the GC data at page 4 of Exhibit 2013, which is JA2748, and compare that to the GC data at page 6, which is Exhibit 2058. And again, 2058, no objections, no hearsay, no authentication objections. I thought we were beyond our time. That's it. Thank you, Your Honor. Thank both parties, and the case is submitted. Thank you, Mr. Secretary. Thank you. All rise.